UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **CAROLINA CATERING CORP.** | Civil Action No. **24-1095** |
| **Plaintiff,** | COMPLAINT FOR MANDAMUS AND DECLARATORY JUDGMENT |
| v. | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY though its SECRETARY ALEJANDRO MAYORKAS; AEROSTAR AIRPORT HOLDINGS, LLC; ROBERTO JIMENEZ SOTO | JURY TRIAL DEMANDED |
| **Defendants.** | |

## COMPLAINT

**COMES NOW**, Plaintiff, Carolina Catering Corp. ("Carolina Catering"), through its undersigned attorneys, and, very respectfully, states and alleges as follows:

### I.   NATURE OF THE ACTION

1. This is an action for mandamus pursuant to the All Writs Acts, 28 U.S.C. § 1651(a) which confers the power of mandamus to federal courts and for declaratory judgment pursuant to 28 U.S.C. § 2201 et seq. and Fed. R. Civ. P. 57 that an expired Permanent Resident Card does not establish that a non-US Citizen is authorized for employment in the United States and, also, is not a valid form of employment authorization to qualify for the issuance of an identification card or badge to work at the Luis Muñoz Marín International Airport ("LMMIA").

### II.   THE PARTIES

2. Plaintiff, Carolina Catering is a corporation organized and existing under the laws of the Commonwealth of Puerto Rico, having a principal place of business at Ave. José A. (Tony) Santana, Airport Services Bldg., Carr. 575 Sector Central, Carolina, Puerto Rico 00983.

Carolina Catering is engaged in the operation of providing in-flight catering services to commercial airlines, both domestic and international, that use the LMMIA).

3. Defendant, the United States Department of Homeland Security ("DHS") is a cabinet-level department of the federal government with responsibility for domestic security, including issues of terrorism, border security, immigration, cybersecurity, and disaster prevention and management. *See Nat'l Treasury Emps. Union v. Chertoff*, 452 F.3d 839, 845, 371 U.S. App. D.C. 463 (D.C. Cir. 2006). Congress created DHS in the Homeland Security Act ("HSA") of 2002, after the terrorist attacks of September 11, 2001, raised "concerns regarding a federal system that diffused the responsibility for domestic security among numerous separate and independent agencies." *Nat'l Treasury Emps. Union v. Chertoff*, 385 F. Supp. 2d 1, 5-6 (D.D.C. 2005); *see* Pub. L. No. 107-296, 116 Stat. 2135 (2002) (codified as amended in scattered sections of 6 U.S.C.). In the resulting agency reorganization, Congress eliminated the Immigration and Naturalization Service ("INS") and replaced it with three sub-agencies that report to DHS: the Bureau of Citizenship and Immigration Services, U.S. Customs and Border Protection, and U.S. Immigration and Customs Enforcement. *See Kaur v. Chertoff*, 489 F. Supp. 2d 52, 55 n.5 (D.D.C. 2007).

4. The DHS is the parent agency of the United States Transportation and Security Administration ("TSA"), a government agency, created by the United States' Congress through the enactment of the Aviation and Transportation Security Act in the wake of the deadly September 11, 2001, terrorist attacks on the United States, and established under the DHS. The TSA has the authority of ensuring the adequacy of security measures at airports and other transportation facilities as well as working in conjunction with the Federal Aviation Administration with respect to any actions or activities that may affect aviation safety or air

carrier operations. 49 U.S.C. § 114. To carry out its functions the TSA is authorized to issue, rescind and revise such regulations as are necessary. Id.

5. The DHS is also the parent agency of the United States Bureau of Citizenship and Immigration Services ("USCIS") succeeded the INS in administering the United States' immigration and naturalization adjudication system. *See* 6 U.S.C. § 271. In the HSA, Congress gave the Director of USCIS authority over adjudications of immigrant visa petitions, naturalization petitions, asylum and refugee applications, and any other issues previously adjudicated by the INS. *Id.* § 271(b). The Secretary of the DHS is Alejandro Mayorkas who is sued in his official capacity.

6. Defendant, Aerostar Airport Holdings, LLC ("Aerostar") is a privately held limited liability company organized and existing under the laws of the Commonwealth of Puerto Rico, having a principal place of business at Terminal D, Airport Road, Carolina, P.R. 00979. Aerostar operates and manages the LMMIA under a is a public-private partnership agreement with the Puerto Rico Ports Authority, owner of the Luis Muñoz Marín International Airport, and is the entity responsible for the security screening, training and credentialing procedures for all employees working in the LMMIA.

7. Defendant, Roberto Jiménez Soto, is an individual, residing in Puerto Rico, who was formerly employed by Plaintiff and has been joined as a defendant as a necessary party in this case as his interests, as a resident alien, may be affected by the outcome of this litigation.

### III.     JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action under U.S. Const. art. 3, § 2; 28 U.S.C. §§ 1331 (United States and its agencies are parties), 28 U.S.C. § 1361 (district courts have original jurisdiction of any action in the nature of mandamus to compel an

3

officer or employee of the United States or any agency to perform a duty owed to the plaintiff) and under the Declaratory Judgment Act 28 U.S.C. §§ 2201 and 2202. The case also involves a controversy affecting United States national security in airports.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because in this judicial district a substantial part of the events giving rise to the claim occurred.

## IV. RELEVANT FACTS

(a) **The Transportation and Security Administration-Background and Powers**

10. Congress established the TSA as a component of the Department of Homeland Security, 49 U.S.C. 114(a), and authorized the TSA to "develop policies, strategies, and plans for dealing with threats to transportation security," including by "coordinating countermeasures with appropriate departments, agencies, and instrumentalities of the United States," 49 U.S.C. 114(f)(3) and (4).

11. Congress also empowered the TSA to "oversee the implementation, and ensure the adequacy, of security measures at airports." 49 U.S.C. 114(f)(11). Congress assigned to the TSA additional responsibilities and powers "during a national emergency," subject to the direction and control of the Secretary of Homeland Security. 49 U.S.C. 114(g)(1); see 49 U.S.C. 114(g)(3) (providing that the Secretary "shall prescribe the circumstances constituting a national emergency for purposes of" Section 114(g)).

12. Among other things, the TSA is charged during such an emergency with "coordinat[ing] domestic transportation, including aviation," and with overseeing "the transportation-related responsibilities of other departments and agencies of the Federal Government." 49 U.S.C. 114(g)(1)(A) and (B).

4

13. The TSA is also responsible during a national emergency for "carry[ing] out such other duties, and exercis[ing] such other powers, relating to transportation * * * as the Secretary * * * shall prescribe." 49 U.S.C. 114(g)(1)(D).

14. When Congress established the TSA, Congress specified that the agency would also inherit certain functions previously exercised by the Federal Aviation Administration. See, Aviation and Transportation Security Act, Pub. L. No. 107-71, § 141(b) and (f), 115 Stat. 643-644.

15. The transfer of those functions has given the TSA three additional responsibilities to ensure the security of civil aviation. See, e.g., 49 U.S.C. 44901 (screening of passengers and property at airports); 67 Fed. Reg. 8340, 8340-8341 (Feb. 22, 2002) (other civil aviation security rules).

16. As relevant here, the TSA regulations require regulated aircraft and airport operators to adopt security programs that provide for "the safety and security of persons and property" traveling on air transportation against specified harms, such as incendiary devices. 49 C.F.R. 1542.101(a)(1) (airports); see 49 C.F.R. 1544.103, 1546.105 (domestic and foreign airlines).

17. The regulations prohibit all persons, including passengers, from circumventing approved security programs. 49 C.F.R. 1540.105(a)(1). The regulations also make clear that the TSA may alter the requirements in security programs, including on an emergency basis, if warranted by safety and security considerations. See 49 C.F.R. 1542.105(c)-(d), 1544.105(c)-(d), and 1546.105(c)-(d).

18. The TSA may issue "Security Directive[s]" that apply to all regulated entities "[w]hen TSA determines that additional security measures are necessary to respond to a threat

assessment or to a specific threat against civil aviation." 49 C.F.R. 1542.303(a) (airport operators); see 49 C.F.R. 1544.305(a) (aircraft operators); see also 54 Fed. Reg. 28,982, 28,982 (July 10, 1989) (Federal Aviation Administration rulemaking explaining that such "Security Directives * * * will eliminate the need to amend the air carriers' ongoing security programs"). Each airport and aircraft operator that is required to have an approved security program "must comply with each Security Directive issued." 49 C.F.R. 1542.303(b), 1544.305(b).

19. The functions of the Secretary of the DHS are defined by statute as follows: "(1) except as otherwise provided by this Act, may delegate any of the Secretary's functions to any officer, employee, or organizational unit of the Department; (2) shall have the authority to make contracts, grants, and cooperative agreements, and to enter into agreements with other executive agencies, as may be necessary and proper to carry out the Secretary's responsibilities under this Act or otherwise provided by law; and (3) shall take reasonable steps to ensure that information systems and databases of the Department are compatible with each other and with appropriate databases of other Departments." *See*, 6 U.S.C. § 112.

20. With respect to homeland security, the Secretary "shall coordinate through the Office of State and Local [Government] Coordination (established under section 801 [6 USCS § 361]) (including the provision of training and equipment) with State and local government personnel, agencies, and authorities, with the private sector, and with other entities, including by—

>   (1) coordinating with State and local government personnel, agencies, and authorities, and with the private sector, to ensure adequate planning, equipment, training, and exercise activities;
>
>   (2) coordinating and, as appropriate, consolidating, the Federal Government's communications and systems of communications relating to homeland security with State and local government personnel, agencies, and authorities, the private sector, other entities, and the public; and

(3) distributing or, as appropriate, coordinating the distribution of, warnings and information to State and local government personnel, agencies and authorities and to the public." *See*, 6 USCS § 112

21. The Secretary of the DHS has the obligation to ensure compliance with the agency's enabling statute and regulations.

22. Aerostar is delegated with the authority to manage and operate the security of LMMIA. As such, it is responsible to enforce the regulations of the TSA, DHS, and Puerto Rico Ports Authority ("PRPA"), among others, related to the security screening of potential airport employees and issuance of identification cards for all employees in the LMMIA.

**(b) The PRPA Regulation for the Issuance of LMMIA Security Identification Cards and the TSA Security Screening Processes**

23. On February 16, 2006 the PRPA approved Regulation No. 7093 titled *"Reglamento para el Cobro por la Emisión de Tarjetas de Identificación en los Aeropuertos, Puertos y Muelles de la Autoridad de los Puertos de Puerto Rico"*.

24. Regulation 7093 was adopted pursuant to Puerto Rico Law No. 125 of May 7, 1942, as amended, Puerto Rico Act No. 170 of August 12, 1988, among other laws and regulations, with the purpose of establishing rules for the control and security mechanisms in the establishment of a system of identification for personnel that performs duties within the premises of, among others, the LMMIA.

25. Pursuant to Regulation 7093 Aerostar collects fees for the issuance of security identification cards for airport personnel, including employees of federal agencies working within LMMIA. For the issuance of security identification cards Aerostar obtains fingerprints, performs background checks and may request letters of recommendation attesting to the personal knowledge of the applicant.

26. The screening of personnel working within the premises of the LMMIA is a matter of national security. Through the Consolidated Appropriations Act of 2008 Congress mandates the TSA to screen all airport workers with unescorted access privileges to secure areas in the airports, including airport employees, commercial airline carrier employees, contractors, and vendors.

27. The TSA has more than 1,200 Transportation Security Inspectors who conduct oversight by inspecting airport, airline, and cargo security operations for compliance with applicable regulations. These inspections are scheduled, conducted randomly, and may include one or all of the security elements required by the TSA.

28. The TSA's oversight of non-TSA airport employees covers a number of different areas, including an airport's security program, its badging process, and "challenge" program.

29. Title 49 CFR §1542; Airport Security, requires that each airport serving domestic and foreign commercial air carriers, such as the LMMIA, have an airport security program. This program must provide for the safety and security of persons and property against acts of criminal violence, aircraft piracy, and the introduction of unauthorized weapons, explosives, or incendiaries onto an aircraft.

30. Of the twenty-one (21) elements required of all airport security plans, three directly relate to the oversight of airport employees, the certification of access control systems, criminal history records checks and the use of personnel identification systems. 49 CFR § 1542.103.

31. An airport's access control system is required to ensure that only those individuals authorized to have unescorted access into the secured or sterile areas are able to gain entry. For those not authorized unescorted access, the airport operator must also establish procedures for

escorting individuals in secured areas of the airport. These requirements ensure escorted individuals are continuously accompanied or closely monitored while in secured areas. 49 CFR § 1542.211

32. An access control system must limit access from the public area to the sterile and secure areas of an airport. The public areas are the portions of an airport such as parking facilities, airline ticketing counters, and baggage claim, where access control or screening is not required. The airport operations area includes aircraft movement areas, aircraft parking areas, loading ramps, and safety areas for use by aircraft. The secure area is the portion of an airport as specified in the Airport Security Plan, where aircraft operators and their contractors enplane and deplane passengers and sort and load baggage. Within the secure area is the sterile area, also a portion of an airport specified in the Airport Security Plan, where individuals have access to boarding aircraft and their property must be screened prior to entering. At many airports, the entire secure area is also defined as a sterile area.

33. To become eligible for unescorted access into the sterile or secured areas, an individual must be subjected to a fingerprint-based criminal history records check and the Security Threat Assessment. 49 CFR § 1542.209

34. For the criminal history records check, the TSA works with the American Association of Airport Executives, which is responsible for collecting this information from airports and providing it to TSA. The TSA then forwards this information to the Federal Bureau of Investigation for processing, and the bureau posts the results to a secure, password-protected website. Aerostar and airline personnel security officers can then review the information and determine whether an individual can be granted access based on a list of disqualifying criminal offenses.

35. Effective October 1, 2007, the TSA mandated that all airport employees would need a TSA-adjudicated Security Threat Assessment before airport operators could issue any type of personnel identification media. This identification, also known as a Secure Identification Display Area (SIDA) badge, is frequently used for unescorted access to the different areas of an airport. *See,* Security Directive, SD 1542-04-08E, Security Threat Assessment and Reporting Requirements for Individuals with Any Form of Airport Personnel Identification Media. The Security Threat Assessment is a TSA-initiated, name-based check that processes individual names through criminal, terrorist, immigration, and admissibility-related databases.

36. Also, as specified in the airport security program pursuant to TSA's Complete Airport Security Program Guide, an airport is required to revalidate or reissue SIDA badges when 5% of all issued, unexpired, identification media are lost, stolen, or otherwise unaccounted. *See*, Complete Airport Security Program Guide for Category X – III Airports. May 10, 2006.

37. When it is determined that 5% of the SIDA badges are unaccounted, the airport must issue new identification media to all authorized persons or revalidate its current SIDA badges. The new or revalidated SIDA badges must be visually distinct from the media being replaced.

38. In addition, the air carriers and airport tenants who receive identification media must provide immediate notification to the airport operator when an individual's access authority is revoked, limited, or the SIDA badge is lost or stolen. When an individual is terminated, the access media must be retrieved and returned to the airport operator.

39. Finally, each airport is also required to establish and implement a challenge program. 49 CFR § 1542.211(d). This program requires each SIDA badge holder to confront any

individual who has accessed the secured areas and is not displaying a SIDA badge that authorizes the individual to be present in the area.

40. The TSA also has developed two additional security programs that focus on airport employee screening. On March 9, 2007, the TSA began conducting ADASP operations nationally, on a mandatory basis. This program was designed to conduct random screening operations in an airport, thus providing an additional layer of security at airports. Under this program, Transportation Security Officers can screen TSA, airline and airport employees, as well as passengers and their accessible property. These officers also can inspect vehicles entering an airport operations area. ADASP operations consist of five screening processes:

    (a) Verification of a SIDA badge within the secure area;
    (b) Screening individuals and their accessible property at a boarding gate;
    (c) Aircraft inspection;
    (d) Explosive Trace Detection sampling of accessible property or aircraft; and
    (e) Cargo screening.

**(c) Security at the LMMIA is a matter of United States national security.**

41. The United States Attorney's Office, United States Attorney's Office, District of Puerto Rico has publicly stated that the LMMIA is a critical point of access for drug trafficking between Puerto Rico and the continental United States.

42. There have been publicly reported incidents of security breaches in various airports, including the LMMIA, among them:

    (a) On December 3, 2020, a federal grand jury in the District of Puerto Rico returned a three-count indictment charging five men and three women, eight (8) individuals who are members of a drug trafficking organization, with conspiracy to possess with intent to distribute controlled substance. The indictment alleges that in 2018, the defendants, together with other persons known and unknown to the Grand Jury conspired to obtain, transport, and distribute narcotics, including cocaine, from Puerto Rico to New York. This drug trafficking organization is a network of recruiters, coordinators, and transporters traveling from the District of Puerto Rico to the continental United States via commercial flights with narcotics for wholesale distribution, all for significant financial gain and profit. The indictment charged the

      defendants with using the airports in Puerto Rico (including LMMIA) to smuggle narcotics, weapons, human cargo, counterfeit documents, illegal proceeds, and other contraband.

(b)   In addition, a federal grand jury in the District of Puerto Rico returned an indictment charging an individual with interfering with security screening personnel at the LMMIA. According to court documents, on November 24, 2022, the defendant assaulted two federal airport and air carrier employees who had security duties within the LMMIA, and such assault interfered with the performance of duties of the employees and lessened the ability of the employees to control the access to the aircraft jet bridge and preventing entry of an unauthorized person into the secured area. The indictment alleges that the defendants, a Spirit Airlines passenger, assaulted two Spirit Airlines employees while attempting to force her way into the jet bridge after she had been removed from the plane.

(c)   Finally, on April 30, 2023 an individual broke through a perimeter security fence in the LMMIA, accessed the airport's runway, stole a Ford truck and drove through the runways and taxiways of the airport, an incident that caused the diversion of airplanes in final approach for landing to the LMMIA. The individual then ran through security checkpoint gate number 1 and escaped the airport facilities until arrested while still driving in PR Route #66.

43.   Without a doubt, these handful examples of just recent security events in the LMMIA show, security in the LMMIA is a matter of United States national security which is yet another reason why the definition of the criteria for the issuance of security clearance credentials to employees working at the LMMIA, which the controversy for which declaratory judgment is sought in this case, is a matter that needs to be declared and adjudicated by this Court.

**(d) <u>Non-US Citizen resident aliens and the employment authorization requirements</u>**

44.   In the United States of America, it is unlawful for a person or other entity:

    (A) to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien (as defined in subsection (h)(3)) with respect to such employment, or

    (B) (i)to hire for employment in the United States an individual without complying with the requirements of subsection (b) […]. 8 USCS § 1324a

45. Subsection (b) of 8 USC § 1342a provides that a person hiring an individual for employment in the United States must attest, under penalty of perjury and on a form designated and approved by the Attorney General of the United States by regulation, that it has verified that the individual is not an unauthorized alien by examining a document establishing both employment authorization and identity such as an unexpired United States passport or an <u>unexpired</u> resident alien card, alien registration card or other document designated by the Attorney General, if the documents contains a photograph of the individual and such other personal identifying information relating to the individual as the United States Attorney General finds, by regulation, sufficient, evidence of authorization of employment in the United States, and contains security features to make it resistant to tampering, counterfeiting and fraudulent use.

46. In compliance with the aforementioned statutory provision, resident aliens applying or working at the LMMIA are required to provide a valid form of identification of the alternatives allowed under Form I-9 to establish both identity and employment authorization, among them, a valid U.S. Passport or U.S. Passport Card, Form i-551, Permanent Resident Card or Alien Registration Receipt Card, Form I-766 Employment Authorization Document Card or a Social Security Card.  All these documents are valid until the expiration date shown on the card.

47. On the other hand, federal immigration laws provide that it is an unfair immigration-related employment practice for a person or other entity to discriminate against any individual (other than an unauthorized alien, as defined in section 1324a(h)(3) of this title) with respect to the hiring, or recruitment or referral for a fee, of the individual for employment or the discharging of the individual from employment (a) because of such individual's national origin,

or (b) in the case of a protected individual (as defined in paragraph (3)), because of such individual's citizenship status. *See,* 8 U.S.C. § 1324b.

48. The same statutory provision states that it shall not apply to discrimination because of citizenship status which is otherwise required in order to comply with law, regulation, or executive order, or required by Federal, State, or local government contract, or which the Attorney General determines to be essential for an employer to do business with an agency or department of the Federal, State, or local government. *See*, 8 U.S.C. § 1324b

49. Carolina Catering has had employees and candidates for employment, including Defendant Roberto Jiménez Soto, who are resident aliens and who, after complying with the Aerostar requirements for the issuance of an airport security identification cards and badges, obtain the identification card or badges and are authorized to work in premises areas within the LMMIA.

50. Nonetheless, Carolina Catering has encountered the situation where applicants for employment, who are resident aliens but who do not have a valid, unexpired, Permanent Resident Card (which is a form of employment authorization) are deemed ineligible to work within the premises of the LMMIA.

51. Also, there have been instances where Carolina Catering employees who are resident aliens have met the requirements for the issuance of an airport security identification card or badge to work in facilities within the LMMIA, but that the Permanent Resident Card expires while employed. In these circumstances, Carolina Catering has deemed these employees no longer eligible to work at LMMIA and they have been terminated from their employment.

52. Currently, Carolina Catering is facing litigation in Puerto Rico courts in the case of <u>Roberto Jiménez Soto v. Carolina Catering Corp.</u>, Civil No. CA2020-CV-00700 filed by

Defendant, Roberto Jiménez Soto, who was terminated from his employment due to being ineligible to work at the LMMIA after his Permanent Resident Card had expired. The former employee claimed that Carolina Catering discriminated against him due to his national origin or social condition as being perceived and treated as an undocumented immigrant because Carolina Catering deemed him not authorized to work in the LMMIA because his Permanent Resident Card had expired. Although the Puerto Rico lower courts ruled that the former employee was discriminated, on January 26, 2024, the Puerto Rico Supreme Court issued a writ of certiorari to review the lower court ruling (PR Supreme Court Case No. CC-2023-733). The litigation in the Puerto Rico courts does not involve the same parties as this case and the Puerto Rico Supreme Court will not decide the issue presented before the Court and for which declaratory judgment is sought in this case.

53.   Faced with the situation where Carolina Catering needs to decide the purely legal question of whether to enforce security regulations for its employees working in the LMMIA or face litigation for discriminatory action resulting from the enforcement of the LMMIA rules established by the TSA and by Aerostar, Carolina Catering requested both entities to clarify if for the issuance or re-issuance of an airport identification card or badge to a non-US citizen employee or applicant for employment who opts to use a Permanent Resident Card as a form of identification, whether the Permanent Resident Card must indeed be valid and current. *See*, **Exhibit A**

54.   Neither the TSA nor Aerostar answered the inquiry presented by Carolina Catering.

...

55. For this reason, and given the unsettled issue presented before Carolina Catering and the consequences to national security and/or to an individual civil rights, Carolina Catering requests that the Court issue declaratory relief in this action.

## V. COUNT II – MANDAMUS

56. Carolina Catering repeats and incorporates by reference the allegations of paragraphs 1-55 above as if fully set forth herein.

57. The Secretary of the DHS has the duty and obligation to ensure the airport security program at the LMMIA provide for the safety and security of persons and property against acts of criminal violence, aircraft piracy, and the introduction of unauthorized weapons, explosives, or incendiaries onto an aircraft.

58. To the extent that Aerostar, who has the delegated authority to establish a compliant airport security program does not have a system in place to ensure that resident aliens with expired resident alien card (which is a form of employment authorization) are disqualified from employment and with access to secured areas of the LMMIA, then Secretary Mayorga is not complying with its statutory obligation to ensure the security and safety of airports in the United States.

59. The All Writs Act allows federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

60. The issuance of a writ of mandamus is necessary to avoid the imminent risk of having individuals employed at the LMMIA, who are resident aliens and whose form of identification is expired, with access to the most secure areas of the LMMIA in violation of the TSA regulations and the duties of the DHA and of its head, Secretary Mayorga.

61. The issuance of a writ of mandamus is necessary and proper as the DHS and Secretary Mayorga have the legal obligation to ensure the security of airports in the United States of America and of Aerostar's compliance with the legal mandate of a complete and compliant airport security program.

62. The issuance of a writ of mandamus is proper and necessary in this case as Carolina Catering, being an entity operating within the premises of the LMMIA and with access to its secured areas, has a legal right to be trained and receive an airport security program that provides for the conditions for continued employment in the LMMIA of resident aliens whose resident alien cards expire while employed and the DHS and Secretary Mayorga have the ministerial duty to ensure that Aerostar has an airport security program in place that provides for the qualification requirements for airport identification of resident aliens who decide to use as a form of identification for employment a resident alien card that expires while employed at the LMMIA.  Carolina Catering has no adequate remedy at law to meet its obligations not to discriminate against resident aliens who seek employment with the company with expired resident alien cards or that while employed their resident alien cards expire and, at the same time, to comply with DHS security requirements as set by law and regulation.

63. Under the All Writs Act, Carolina Catering, respectfully requests, the Court to issue a writ of mandamus directed to Secretary Mayorga to take all necessary measures within the statutory authority granted to him to ensure compliance by Aerostar of a provision in the airport security program for the LMMIA that expressly provides for the qualification, or lack thereof, for access to secure and sterile areas of the LMMIA of a resident alien who uses an expired resident alien card as a form of identification for employment or whose resident alien

card expires while employed with access to secure and sterile areas of the LMMIA and does not provide a renewed resident alien card.

## VI. COUNT II – DECLARATORY JUDGMENT

64. Carolina Catering repeats and incorporates by reference the allegations of paragraphs 1-63 above as if fully set forth herein.

65. An actual controversy exists between Carolina Catering and Defendants as to whether a non-US citizen employee or applicant for employment at the LMMIA who opts to use a resident alien card as a form of identification, must present a valid and current resident alien card or if, instead, an expired card suffices.

66. An actual controversy also exists between Carolina Catering and Defendants in the situation where a non-US citizen applicant for employment presents as a form of identification a resident alien card that is set to expire and; therefore, would make the employee ineligible for employment soon after the hiring decision is made.

67. Carolina Catering is faced with the decision of either employing the candidate, knowing that the form of identification presented will expire making him or her ineligible for employment in secure and sterile areas of the LMMIA or not employ the candidate of employment and expose itself to a discrimination claim. The controversy between the parties is sufficient to entitle Carolina Catering to a declaratory judgment pursuant to 28 U.S.C. § 2201 et seq. and Fed. R. Civ. P. 57 that an expired resident alien card is not sufficient to establish that a non-US Citizen is authorized for employment in the United States and, also, is not a valid form of employment authorization to qualify for the issuance of a identification card or badge to work in premises of the LMMIA.

## VII. PRAYER FOR RELIEF

**WHEREFORE**, Carolina Catering, respectfully requests, that this Court: (i) grant and issue a writ of mandamus to directed to Secretary Mayorga to take all necessary measures to ensure compliance by Aerostar of a provision in the airport security program for the LMMIA that expressly provides for the qualification, or lack thereof, for employment of a resident alien who uses an expired resident alien card as a form of identification and to issue a declaratory; and (ii) for the issuance of a declaratory judgment that an expired resident alien card, or one that is about to expire, is not sufficient to establish that a non-US Citizen is authorized for employment in the United States and, also, is not a valid form of employment authorization to qualify for the issuance of a identification card or badge to secure an airport id required to perform work within the premises of the LMMIA; (iii) and grant any such other and further relief as the Court may deem just and proper.

**RESPECTFULLY SUBMITTED**.

In Guaynabo, Puerto Rico this 1st day of March 2024.

> **DELGADO & FERNÁNDEZ, LLC**
> P.O. Box 11750
> Fernández Juncos Station
> San Juan, Puerto Rico 00910
> Tel.: (787) 274-1414
> Fax: (787) 274-1616
>
> s/**ALFREDO FERNÁNDEZ MARTÍNEZ**
> USDC-PR-210511
> afernandez@delgadofernandez.com
>
> s/ **PEDRO HERNÁNDEZ FREIRE**
> USDC-PR-
> phernandez@delgadofernandez.com

19